**IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| In re: § | |
| § | Chapter 11 |
| BENTLEY PREMIER BUILDERS, LLC, § | |
| § | |
| Debtor. § | Case No. 13-41940-BTR-11 |

**SANDY GOLGART'S MOTION FOR RECONSIDERATION
TO ALTER OR AMEND JUDGMENT AND RELATED RELIEF,
RELATED TO ORDERS ON CONFIRMATION OF PLANS (DKTS. 603, 613, AND 614),
PER FEDERAL RULES 59 AND 60, AND BANKRUPTCY RULES 9023 AND 9024**

TO THE HONORABLE BRENDA T. RHOADES
CHIEF UNITED STATES BANKRUPTCY JUDGE:

**NO HEARING WILL BE CONDUCTED ON THIS MOTION UNLESS A WRITTEN OBJECTION IS FILED WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT AND SERVED UPON THE PARTY FILING THIS PLEADING WITHIN TWENTY-ONE (21) DAYS FROM THE DATE OF SERVICE UNLESS THE COURT SHORTENS OR EXTENDS THE TIME FOR FILING SUCH OBJECTION.  IF NO OBJECTION IS TIMELY SERVED AND FILED, THIS APPLICATION SHALL BE DEEMED TO BE UNOPPOSED, AND THE COURT MAY ENTER AN ORDER GRANTING THE RELIEF SOUGHT.  IF AN OBJECTION IS FILED AND SERVED IN A TIMELY MANNER, THE COURT WILL THEREAFTER SET A HEARING.  IF YOU FAIL TO APPEAR AT ANY SCHEDULED HEARING, YOUR OBJECTION MAY BE STRICKEN.  THE COURT RESERVES THE RIGHT TO SET A HEARING ON ANY MATTER.**

COMES NOW, Sandy Golgart (the "Movant"), creditor and interested-party in the above-referenced Chapter 11 case (the "Bankruptcy Case"), and file this, her *Motion for Reconsideration to Alter or Amend Judgment and Related Relief* (the "Motion"), related to the orders and entries at Dkts. 603, 613, and 614 (collectively, the "Confirmation Orders").  In support hereof, the Movant respectfully shows the Court the following:

## I.  JURISDICTION AND VENUE

1. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 1334 and 157 and 11 U.S.C. § 105. This Motion is a core matter pursuant to 28 U.S.C. § 157(b). Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The relief requested by this Motion is predicated by Federal Rules of Civil Procedure 59 and 60, as well as Federal Rules of Bankruptcy Procedure 9023 and 9024.

## II.  SUMMARY OF RELIEF

3. The Movant respectfully requests that the Court reconsider the Confirmation Orders to alter or amend certain findings and conclusions therein in light of the facts and argument below. The Movant respectfully submits that certain findings and conclusions were not supported by the evidence and/or were not necessary for the rulings in the Confirmation Rulings.

## III.  BACKGROUND

4. The Court held the contested confirmation hearings on March 28, 2014, March 31, 2014, and April 1, 2014, with closing arguments on April 10, 2014.

5. The Court entered orders denying Movant's plan and confirming the lenders' plan on June 26, 2014 (dkts 613 and 614), with findings and conclusions entered June 13, 2014 (dkt 603).

## IV.  ARGUMENT AND RELIEF REQUESTED

6. For the reasons stated herein, Movant respectfully requests that the Court reconsider the Confirmation Orders and alter or amend certain findings and conclusions therein in light of the facts and argument herein.

**A.  Authority for Relief Requested under Bankruptcy Rule 9023 and Federal Rule 59**

7. Movant requests the Court reconsider the Confirmation Orders pursuant to Fed. R. of Bankr. P. 9023 and Fed. R. Civ. P. 59. *See Fletcher v. Apfel*, 210 F.3d 510, 511–12 (5th Cir. 2000) ("A motion to reconsider which challenges a prior judgment on the merits will be treated as a Federal Rule of Civil Procedure 59(e) motion if it is served within ten [now fourteen] days after entry of the judgment.").

8. Bankruptcy Rule 9023 states, "Except as provided in this rule and Rule 3008, Rule 59 F.R.Civ.P. applies in cases under the Code.  A motion for a new trial or to alter or amend a judgment shall be filed, and a court may on its own order a new trial, no later than 14 days after entry of judgment."  Movant has filed this Motion within 14 days of entry of the Confirmation Orders.

9. Federal Rule 59(a)(2) allows a court to open a judgment from a nonjury trial, take additional testimony, amend or make new findings and conclusions, and enter a new judgment. Similarly, "Rule 59(e) serves the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence." *See In re Berg*, 383 B.R. 631, 639 (Bankr. W.D. Tex. 2008) (citing *Templet v. HydroChem, Inc.*, 367 F.3d 473, 479 (5th Cir. 2004)).  The relief a court may grant is at least as broad as what a court may grant under Rule 60.[1]

---

[1] Rule 60(b)(6) allows a court to grant a party relief from a judgment for "any other reason that justifies relief." *See* Fed. R. Civ. P. 60(b)(6).  As noted in the Berg case, "Rule 59 establishes a lower threshold than Rule 60." *See* Berg, 383 B.R. at 644.  However, Rule 60 provides courts the "authority adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice, . . ." *See id.* (citing *Klapprott v. United States*, 335 U.S. 601 (1949)).  "Because rule 59(e) motions are subject to much more stringent time requirements than Rule 60(b) motions, Rule 59(e) motions provide relief for the movant on grounds at least as broad as Rule 60 motions." *See id.* at 639 (citing *Lavespere v. Niagara Machine & Tool Works, Inc.*, 910 F.2d 167, 173–74 (5th Cir. 1990) *abrogated on other grounds by Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994)).  Therefore, the Court is able to grant relief to at least the extent permitted by Rule 60 under a motion made pursuant to the less stringent requirements of Rule 59.

10. Generally speaking "Rule 59(e) does not set forth any specific grounds for relief." *See Berg*, 383 B.R. at 640. However, case law in the Fifth Circuit has set forth two basic grounds[2] for granting relief under Rule 59(e), which are (i) to present newly discovered evidence or (ii) to correct manifest errors of law or fact.[3]

11. Consideration of a motion under Rule 59(e) is within the sound discretion of the bankruptcy court and the "Fifth Circuit Court of Appeals has held that a court has considerable discretion in deciding whether to grant a motion under Rule 59(e)." *See In re Salter*, 213 B.R. 116, 118 (Bankr. S.D. Miss. 1997) (citing 3 Shepard's Editorial Staff, *Motions in Federal Court* § 9.64 (3d ed. 1996) (internal citations omitted)). Rule 59(e) is equitable in nature. *See Berg*, 383 B.R. at 639 ("Rule 59(e), therefore, provides district courts with the power to consider equitable factors and provide relief for any reason justifying relief from the operation of the judgment.") (internal citations omitted).

12. The Fifth Circuit does not engraft the requirements of Rule 60(b) onto a Rule 59(e) motion. *Id.* at 640. Instead, the Fifth Circuit's position can be stated as follows:

> Therefore, the 5th Circuit has concluded that in order to reopen a case under Rule 59(e) on the basis of evidentiary materials that were not timely submitted, the mover **need not** first show that the default was the result of mistake, inadvertence, surprise or excusable neglect or that the evidence is such as to show that the judgment is manifestly wrong.

---

[2] A motion to reconsider may also properly be granted on the basis of an intervening change in controlling law. *See In re Benjamin Moore & Co.*, 318 F.3d 626, 629 (5th Cir. 2002). Movants do not assert by this Motion that an intervening change of law has occurred.

[3] *See Berg*, 383 B.R. at 640 (citing *Templet v. HydroChem, Inc.*, 367 F.3d 473, 479 (5th Cir. 2004)); *Pluet v. Frasier*, 355 F.3d 381, 384 n.2 (5th Cir. 2004) (quoting *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990)) ("Motions for new trial or to alter or amend judgment must clearly establish either a manifest error of law or fact or present newly discovered evidence."); *see also In re Hence*, 358 B.R. 294, 308 (Bankr. S.D. Tex. 2006).

*See id.* (emphasis added) (citing *Lavespere v. Niagara Machine & Tool Works, Inc.* 910 F.2d 167, 173 (5th Cir. 1990)).

13. When a court exercises its considerable discretion in determining whether to grant a motion under Rule 59(e), the court will consider the competing judicial imperatives of (1) the need to bring litigation to an end, and (2) the need to render just decisions on the basis of all the facts. *See id.* (citing *Lavespere v. Niagara Machine & Tool Works, Inc.* 910 F.2d 167, 174 (5th Cir. 1990)); *see also Salter*, 213 B.R. at 118 (citing *Edward H. Bohlin Co., Inc. v. Banning Co., Inc.*, 6 F.3d 350, 355 (5th Cir. 1993)) ("The court must strike the proper balance between two competing imperatives: (1) finality and (2) the need to render just decisions on the basis of all the facts"). It is the task of the trial court to balance these two competing interests. *See Berg*, 383 B.R. at 640.

14. In this case, the Movant seeks reconsideration only of certain specified findings and conclusions. Thus, there is no cause for concern on delay or prejudice to the Debtor, its lenders, or its creditors, but this Motion seeks only to redress prejudice caused solely upon the Movant.

**B. Specific Findings Sought to be Altered or Amended**

15. The Movant respectfully requests the following findings be removed or altered in an amended set of findings and conclusions[4] for the following reasons.

    **A.    Dkt. 603, Section III. Factual Background and Findings of Fact**

Finding ¶ 3 – "Pourchot and Golgart, however, were not victims of the real estate market." Instead, the evidence indicates Pourchot and Golgart went into business together to become home builders and the real estate market had a detrimental impact upon their business, including

---

[4] The Confirmation Orders note "To the extent any findings of fact are construed to be conclusions of law, they are hereby adopted as such. Likewise, to the extent any conclusions of law are construed to be findings of fact, they are hereby adopted as such." See, e.g., Dkt. 603, fn 1. Accordignly, to the extent something in this Motion is refered to as a finding of fact but is instead construed to be a conclusion of law, it is hereby adopted as such, and vice versa.

the financing they could obtain, the number of lots they could sell, and the number of homes they could build.

Finding ¶ 4 – "The Debtor also purchased lots in the Normandy Estates subdivision beginning in 2008." Instead, the evidence indicates the lots were purchased beginning in November of 2008.

Finding ¶ 4 – "In 2011, the Debtor acquired approximately 70 lots – all of the remaining lots – in the Normandy Estates subdivision from a distressed real estate company." Instead, the evidence indicates the Debtor acquired lots in the Normandy Estates subdivision from Hawkins Welwood, which was and is a home builder rather than a real estate company.

Finding ¶ 5 – "The Debtor adopted names for the different sizes of lots as a marketing strategy." Instead, the evidence indicates lot names were designated by the city and developer prior to the Debtor's acquisition of the lots.

Finding ¶ 5 – "Pourchot wanted Golgart to be happy and intended for her to become rich through their real estate venture. Golgart viewed the Debtor's business as her business." Instead, the evidence does not support these facts.

Finding ¶ 6 – "Pourchot wanted Golgart to be happy and intended for her to become rich through their real estate venture. Golgart viewed the Debtor's business as her business." Instead, the evidence does not support these facts.

Finding ¶ 7 – "The Debtor borrowed the principal sum of $23,485,528.42 from the Pourchot Trust between 2008 and 2012…." Instead, the evidence indicates the Debtor borrowed from both the Pourchot Trust and Phill Pourthot personally between 2008 and 2011, not in 2012.

Finding ¶ 8 – "The non-default interest rate under the Trust Loan is the same rate Pourchot was being charged for the funds he borrowed to loan to the Debtor." Instead, the evidence indicates Pourchot charged a higher rate of LIBOR plus .84% than the .75% he was charged to borrow the funds.

Finding ¶ 10 – "The Debtor never made any payments to the Pourchot Trust under the Trust Note." Instead, the evidence indicates the Debtor offered to make payments but the payments were refused by Pourchot. Also, due to the subordination agreement, there were only a few months that interest payments could have been made.

Finding ¶ 10 – "Likewise, the Debtor has never made any payments to the Pourchot Trust under the Subsequent Loans." Instead, the evidence indicates that, when the Sovereign Note was purchased by Pourchot, there were enough funds in escrow to pay for at least 2.5 months of interest. Pourchot withdrew such funds from the interest account and refused to renew the note.

Finding ¶ 11 – "The Pourchot Trust did not immediately declare the Debtor in default or immediately initiate any collection activity with respect to the Trust Note or the

Subsequent Loans." Instead, the evidence indicates that Pourchot did initiate foreclosure attempts immediately after Pourchot bought the Sovereign Note without Golgart's consent or notice, to which Sovereign Note Pourchot was subordinated.

Finding ¶ 12 – "Phillip Pourchot is the co-Trustee of the Pourchot Trust." Instead, the evidence indicates that Pourchot is the Trustee and settlor of the Pourchot Trust with all powers to act as the sole trustee of the Pourchot Trust.

Finding ¶ 14 – "In addition to amounts borrowed from the Pourchot Trust, the Debtor borrowed $7,250,000 from Sovereign Bank, as evidenced by a promissory note dated May 10, 2011, and secured by a deed of trust covering approximately 100 residential lots and two commercial lots." Instead, the evidence indicates the deed of trust covered only approximately 70 residential lots.

Finding ¶ 14 – "The Sovereign Bank note required monthly interest payments and had a one year maturity with an option for an additional 12 months. Instead, the evidence indicates the Sovereign Bank note was renewable through negotiations and it was understood it would take approximately five years, not one, to pay back.

Finding ¶ 15 – "Sovereign Bank asked both Golgart and Pourchot to personally guaranty the Debtor's obligations under the note. Golgart refused." Instead, the evidence does not support these facts. Sovereign Bank did not testify and there was no evidence at trial that these events occurred. Movant maintains her guaranty was never discussed, never asked for, and never refused.

Finding ¶ 16 – "Thus, Golgart limited her ultimate financial exposure to her initial investment of $500,000 while Pourchot, individually or through the Pourchot Trust, had financial exposure in excess of $30,000,000. Instead, the evidence indicates that Pourchot and Golgart never agreed the Debtor would be purchasing so much property at inception or soon thereafter. Pourchot insisted that, when he did request the purchases be made, that he would never require Golgart to fund any more or to guaranty anything. Further, Pourchot's "exposure" was secured by liens on substantially all assets, whereas Golgart's exposure included not only money but years of services, all without any liens or foreclosure leverage.

Finding ¶ 17 – "The Debtor's office is located in a model home built by the Debtor in the Normandy Estates subdivision." Instead, the evidence indicates the Debtor's offices were at 5113 Meadowside Lane, Plano Texas, where the corporate office stayed registered even as of the bankruptcy petition date. The only reason the Debtor subsequently operated out of the model was because Pourchot locked Golgart out of the original office, put the Debtor's files into the garage, where Golgart was forced to office without heat, air, or bathroom. Thereafter, Golgart put a desk in the model home to work out of its garage with the Debtor's files.

Finding ¶ 18 – "The personal relationship between Golgart and Pourchot deteriorated after they formed the Debtor. They sometimes spoke only through lawyers." Instead, the evidence indicates the parties' personal relationship deteriorated in 2012, well after they formed the

Debtor in 2007.  In 2013, Pourchot still was asking Golgart to move back to her and Pourchot's home, and gave her a key to same.

Finding ¶ 18 – "Golgart increasingly excluded Pourchot from participating in the Debtor's business decisions."  Instead, the evidence indicates Pourchot still was involved with the Debtor's business decisions, to the extent he wanted to be so involved, through 2012.

Finding ¶ 19 – "As their personal relationship deteriorated, Pourchot's role in the Debtor's business became more limited."  Instead, the evidence indicates Pourchot limited himself in his role in the Debtor's business.  In November 2012, while still active in the Debtor's business, Pourchot still had the Debtor's server located in his home, and crashed the Debtor's harddrive for the third time.

Finding ¶ 21 – "Pourchot and Golgart are not licensed as brokers or appraisers."  Instead, the evidence indicates Pourchot and Golgart were not in the business of real estate development or appraisal, but were in the business of a home builder.  Hence, they required no licenses as brokers or appraisers in working for the Debtor.

Finding ¶ 21 – "Golgart priced the lots for the Debtor. Pourchot did not research the prices the Debtor was asking for its lots."  Instead, the evidence indicates Pourchot priced the lots for the Debtor in November 2012.  The evidence does not support that Pourchot did no research on pricing.

Finding ¶ 21 – "He [Pourchot] relied on Golgart's assessment of the value of the lots as well as the value of the Debtor's construction business."  Instead, the evidence indicates the Debtor employed Zachary Luderman from August 2010 to July 2012 at $250,000 per year to price lots, price build jobs, and put together the Debtor's contracts.  Luderman worked with both Pourchot and Golgart along with Brian Donavan.

Finding ¶ 22 – "The Debtor purportedly showed a profit in 2012, according to Golgart's description of its tax return for that year…."  Instead, the evidence indicates the Debtor had a certified CPA that did the Debtor's taxes and prepared the Debtor's 2012 tax return confirming a profit in 2012.

Finding ¶ 22 – "…but the Debtor was not paying all of its bills during that period [2012]."  Instead, the evidence does not support this finding as there was no testimony as to debts owed in 2012 in excess of profits made, or at all.

Finding ¶ 24 – "The Debtor operated its business out of one bank account. Pourchot was unable to access current, online information about the Debtor's bank account after November 2012, and he demanded that Golgart provide him with documentation concerning the Debtor's financial status."  Instead, the evidence indicates pourchot had statements mailed to his own address and that Pourchot had online access with his own password (as opposed to Golgart's password) to accounts, including the bank account at Bank of America, to which Golgart did not have access.

Finding ¶ 25 – "Sovereign Bank refused to consider extending the maturity date unless the Debtor began making payments on the principal balance."  Instead, the evidence did not support this "refusal" as there was no such evidence.  Further, the evidence indicated the Debtor had paid down its principal debt by approximately $1.25 million, and had millions more on hold pending lot sales, including to the Harts, Harders, Rivas, Abbas, Smiths, and commercial, with over $500,000 cash escrowed per even the Trustee's own MORs and cash collateral pleadings.

Finding ¶ 26 – "Because the Debtor did not have the means to refinance or pay off the note…." Instead, the evidence did not support this fact.

Finding ¶ 26 – "…Pourchot formed Starside to acquire the interests of Sovereign Bank and its note and deed of trust."  Instead, the evidence indicates Pourchot had been considering and/or working with Barclays to acquire Starside's note since August 2012.

Finding ¶ 27 – "Golgart nonthless asserts that Pourchot violated Section 5.09 of the Bentley Company Agreement…."  This issue related to ultimate allowance of claims and counterclaims, which were not at issue at the confirmation hearings; rather, merely claim estimation on amounts and interest calculations was tried.

Finding ¶ 28 – "The Debtor stopped making payments on the Sovereign Bank note after the assignment to Starside."  Instead, the evidence indicates this occurred because Pourchot took Debtor's interest money from Sovereign Bank and did not apply the funds properly to the loan and then called the note.  Pourchot gave no renewal offer to the Debtor, as had previously been done with the third-party Sovereign Bank.

Finding ¶ 29 – "As of March and April 2013, Pourchot believed that the Debtor's property would sell itself over time because it had so much potential if managed properly."  Instead, there is no evidence to indicate Pourchot and Golgart mismanaged the Debtor's dirt lots to prevent their sale.

Finding ¶ 29 – "He [Pourchot] made a list of things he saw to be incorrect in Golgart's management of the Debtor, and he met with Golgart to discuss the issues on the list in April 2013."  Instead, the evidence indicates the list was not about management issues, but was a demand by Pourchot to take full control of the Debtor or else destroy Golgart.  Their discussion of the list included not management issues but rather Pourchot telling Golgart that "The man with the checkbook always wins, and I will bury you with attorney fees if you don't do what I say."

Finding ¶ 30 – "By the time Pourchot and Golgart met in April 2013, Golgart had formed another company, HKG PROPERTIES, LLC."  Instead, the evidence indicates the only reason Golgart formed HKG was to place assets for Golgart's daughter based upon discussions with Pourchot for estate planning like Pourchot had done.  The only reason that it would do home-building business was because the Duncans and Smith wanted homes built, which the Trustee agreed could be done outside of the Debtor but not by the Debtor.

Finding ¶ 32 – "Golgart, without the consent of Pourchot, filed this bankruptcy case for the Debtor on the day of the posted foreclosure sale."  Instead, the evidence indicates the reason Pourchot would not consent to the bankruptcy was because it forestalled his attempts to foreclose and remove all estate property from creditors' reach.

Finding ¶ 34 – "The Debtor currently owns approximately 75 acres of land located generally at Spring Creek Parkway and Tennyson Parkway and commonly known as the Normandy Estates subdivision. Most of the land is subdivided into lots…."  Instead, the evidence indicates the Debtor owns only lots and does not own the amenities center, guard shack, roads, and other common grounds and areas.

Finding ¶ 35 – "…the Debtor has sold only seven lots since 2008."  Instead, the evidence indicates Normandy lots were not approved by the city for sale until 2009 when the real estate market was bottoming out.  The Debtor was arguably unsuccessful in selling lots only during the worst housing market in this Country's history.

Finding ¶ 37 – "In addition, the Debtor owns the common area property including an amenities center, guard house, fencing, pool workout facility, and related common area properties for the Normandy Estates subdivision. The Debtor, however, had not maintained the common areas prior to bankruptcy. The landscaping was in poor condition, and the gates to the subdivision were not working, among other problems."  Instead, the evidence indicates the Debtor owns only lots and does not own the amenities center, guard shack, roads, and other common grounds and areas, which are owned by the respective HOAs and their members.

Finding ¶ 39 – "Golgart had little experience in building homes prior to forming the Debtor. She is not a licensed builder; she is not a licensed real estate broker; she is not a licensed realtor. She had never managed a subdivision prior to her involvement with the Debtor."  Instead, the evidence does not support these findings.  While Golgart is not a licensed real estate broker or realtor, she does not require such licenses to work for the Debtor, which builds homes.  Also, Golgart and the Debtor were not in the business of managing subdivisions, the Debtor was a custom-home builder.

Finding ¶ 40 – "Notwithstanding her scant experience, she has been the "face" of the Debtor. She has held herself out as the manager of the Debtor's business of developing subdivisions…."  Instead, the evidence does not support these findings.  In numerous publications, including the Dallas Business Journal, D Magazine, On Magazine, and Savvy Magazine, throughout 2010-2013, both of Pourchot and Golgart were named and pictured as the face of the Debtor.  Also, the Debtor employed numerous other persons to run the business, including Zachary Luderman, Brian Donavan, and others.  Further, the evidence does not indicate the Debtor was in the business of developing subdivisions or that Golgart held herself out as such.

Finding ¶ 41 – "Golgart's testimony that the Debtor entered bankruptcy with $500,000 of uncollected accounts receivable was not credible or supported by the evidence at trial."  Instead, the evidence indicates the amounts were due, were reflected in the Debtor's books, and were

discussed in detail within claim objections filed by Golgart to which no substantive responses were filed to rebut the validity of her filings asserting amounts due.

Finding ¶ 42 – "The Debtor entered into contracts to build 10 homes between 2007 and August 6, 2013 (the bankruptcy petition date). At least five of those customers fired the Debtor and hired another contractor to finish the jobs. The Debtor actually built less than one house per year on average." Instead, the evidence does not support these findings. The Debtor built approximately 15 homes between 2011 and August 6, 2013. There was no evidence or testimony of home owners "firing" the Debtor and "hiring" other contractors. Some contracts were canceled or terminated, including by the Trustee. Only the Loughboroughs and Klements actually finished their homes with other builders after start by the Debtor. The Debtor built five homes per year on average between 2011 and 2013.

Finding ¶ 43 – "The bids the Debtor submitted to customers were much lower than bids offered by other builders of high-end homes. The preponderance of the evidence established that the Debtor, under Golgart's management, entered into money-losing contracts for the construction of new homes. Further, the Debtor's customers were unhappy with the quality of the Debtor's work." Instead, the evidence does not support these findings. The Debtor did not "bid" jobs against other builders; only approved builders were allowed to build on the Debtor's lots. Builders who testified as to job costs are not approved to build on the Debtor's lots and the fact that their prices are inflated above market prices on dissimilar homes is not indicative of what should be charged in the Debtor's HOAs, and there was no evidence that such was the case in such HOAs. Zachary Luderman, not Golgart, was responsible for establishing prices on the Debtor's build jobs. There was no testimony by any customers that they were unhappy with the quality of the Debtor's work.

Finding ¶ 43, fn 5 – Golgart's position is that the Debtor should reject these money-losing contracts, leaving the homeowners with partially built homes. Instead, the evidence does not support this finding. Golgart's position is that homeowners that signed binding contracts should perform under said contracts and pay all amounts due for all work done, and this did not happen.

Finding ¶ 44 – "Among other problems, the Debtor failed to pay all the bills due to mechanics and materialmen, and liens were placed on customers' homes." Instead, the evidence indicates such liens were placed on homes only because section 362 of the Bankruptcy Code precluded payment of prepetition claims. Further, when Golgart and the Debtor filed expedited motions to pay such claims, the Trustee pulled such motions promptly after his appointment, which prevented payment and prompted liens.

Finding ¶ 45 – "Of the limited number of houses the Debtor built or started to build for customers, six customers have asserted proofs of claim against the Debtor totaling approximately $800,000. They all voted to reject Golgart's proposed plan. Golgart signed affidavits supporting objections to the allowance of their claims after they voted against her plan. Immediately prior to the Consolidated Hearing, however, Golgart reached agreements to allow the claims of the homeowners and several other creditors for voting purposes." Instead, the evidence does not support these findings. The evidence proved such claims were intentionally inflated with the

particular intent to vote against Golgart's plan. Further, substantive objections were filed by Golgart explaining the issues with such claims, to which no substantive responses were filed by the alleged claimants, some of whom claim even six figures related to costs of relocation and repurchase of land. The objections filed were not new concepts created after the claimants voted against Golgart's plan, but, rather, were consistently held as disputed by Golgart from the inception of the case and were filed in line with the Court's order directing such objections by the date they were filed. Thus, Golgart merely filed objections in conformance with her long-maintained position and the Court's order to do so. That Golgart reached agreement on allowance of claims for voting purposes only is a reflection of her willingness to save time on material confirmation and related issues and her reluctance to succumb to the claimants' threats to indefinitely delay confirmation if agreement was not reached. Golgart fully stands by her objections to claims for the reasons stated therein, and withdrew same only due to confirmation of Pourchot's plan that summarily removed all creditors' abilities to object to claims.

Finding ¶ 46 – "Golgart's conflicts with customers and her management of the Debtor have depressed the value of the Debtor's business. These problems existed prior to the initiation of litigation between Golgart and Pourchot." Instead, the evidence indicates there was nothing wrong with the Debtor's business until competing builders began creating issues by talking with the Debtor's customers.

Finding ¶ 47 – "The real estate company that owned Normandy Estates prior to the Debtor failed, and the Debtor's business has shown virtually no signs of success." Instead, the evidence does not support these findings. The prior owner of the Debtor's lots, Hawkins Welwood, did not fail, is fully operational, and now, due to Pourchot's actions as head of the Normandy HOA, has been added as an approved builder in the Normandy HOA. As much as Hawkins Welwood did not fail, nor did Debtor. The Debtor's business ramped up in 2011 and 2012 prior to Pourchot's foreclosure attempts made while the market was beginning its correction.

Finding ¶ 49 – "The Chapter 11 Trustee discovered that the Normandy Estates HOA was not functioning." Instead, the evidence indicates Golgart informed the Trustee of the HOA issues the Debtor was dealing with, attempted to pay for necessary repairs and maintenance, but was refused.

Finding ¶ 50 – "The Chapter 11 Trustee asked Powell and Pourchot to serve on the board of directors for the Normandy Estates HOA during the Debtor's bankruptcy. He also asked Dr. Castleberry, who lives in the subdivision. He did not ask Golgart, because the homeowners in the Normandy Estates subdivision strongly dislike her." Instead, the evidence indicates Golgart was informed by the Trustee he was asking both Golgart and Pourchot to resign so he could appoint independent persons only, and then appointed Pourchot back to the HOA after Golgart agreed to step down.

Finding ¶ 53 – "Pourchot testified, credibly, that he feels a moral obligation to satisfy the Debtor's obligations, especially the Debtor's obligation to its customers. Instead, the evidence cannot possibly sustain this finding. The evidence indisputably showed that Pourchot had attempted to foreclose on substantially all assets of the Debtor, depriving not only Golgart of the

use of the Debtor's assets, but all creditors of the benefits of same. Golgart's plan would pay all creditors in full as well, including being backed by Golgart's personal cash and real estate holdings. Further, the evidence showed that Pourchot argued Golgart's plan to be not feasible because all claims would not be paid. Hence, the only evidence of Pourchot's obligation to satisfy the Debtor's obligations was if Pourchot's plan, not Golgart's or any other, was confirmed.

### B.    Dkt. 603, Section IV. Summary of the Competing Plans

Finding ¶ 6 – "With respect to the proposed auction of the Debtor's equity, the Chapter 11 Trustee sent letters to prospective bidders." Instead, the evidence did not contain any such letter or confirm any of its recipients.

### C.    Dkt. 603, Section V. Legal Analysis and Conclusions of Law

Conclusion ¶ 7 – "They established by a preponderance of the evidence that Starside acquired the Sovereign Bank note in good faith. Further, the acquisition of the Sovereign Bank note by Starside did not violate the Company Agreement." Instead, the evidence does not support these conclusions. As an initial matter, the evidence would have shown only that Starside acquired the Sovereign Bank note so as to foreclose upon the Debtor's assets when Pourchot could not otherwise do so. Further, this matter was not in issue at the confirmation hearings, which sought only to estimate the claims of the Debtor's lenders rather than adjudicate their merits as a final determination.

16. For all of the above reasons, the Movant requests that the Court enter an order allowing the modification altering or amending the above-referenced findings and conclusions.

## C.  Authority for Relief Requested under Bankruptcy Rule 9024 and Federal Rule 60

17. In the alternative, and to the extent necessary, Movant requests relief under Fed. R. Civ. P. 60(b) as made applicable by Fed. R. of Bankr. P. 9024.[5]

18. Federal Rule of Civil Procedure 60(b) reads in relevant part as follows:

> On motion and just terms, the court may relieve a party…from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect … (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b), …or (6) any other reason that justifies relief.

*See* Fed. Rule Civ. P. 60(b).

---

[5] Federal Rule of Bankruptcy 9024 makes certain variations to Rule 60 which are not applicable here.

19. Federal Rule 60(c) requires that the motion be made within a reasonable time. As stated above, Movant has filed this Motion within 14 days of entry of the Confirmation Orders and, therefore, asserts that this Motion has been filed within a reasonable time and not beyond one year of the entry of the order as required by Rule 60(b).

20. For the reasons stated above, Movant requests reconsideration and modification of the Confirmation Orders.

**WHEREFORE, PREMISES CONSIDERED**, for the reasons stated above, the Movant prays that the Court grant this Motion in its entirety, reconsider and modify the Confirmation Orders so as to alter and/or amend the specific findings and conclusions addressed herein, and grant the Movant such other and further relief as the Court deems just and equitable.

[Remainder of Page Intentionally Blank]

Dated: July 10, 2014.                                   Respectfully submitted:

                                            */s/Mark A. Castillo*
                                            Mark A. Castillo
                                            Texas State Bar No. 24027795
                                            Joshua L. Shepherd
                                            Texas State Bar No. 24058104
                                            Curtis | Castillo PC
                                            901 Main Street, Suite 6515
                                            Dallas, Texas 75202
                                            Telephone: 214.752.2222
                                            Facsimile: 214.752.0709

                                            COUNSEL FOR SANDY GOLGART

## **CERTIFICATE OF SERVICE**

This is to certify that, on July 10, 2014, a true and correct copy of the foregoing document was served upon the Chapter 11 Trustee, Jason Searcy, the U.S. Trustee, counsel for the Pourchot Lenders, and to all other parties requesting notice or listed on the attached matrix, including the Debtor's known secured creditors and unsecured creditors, by first class mail, postage pre-paid.

                                            */s/Mark A. Castillo*
                                            Mark A. Castillo